## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### PARKERSBURG

**RUSSELL CHARLES BUSKIRK,**

      **Plaintiff,**

v.                                                   **CASE NO. 6:11-cv-00685**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Russell Charles Buskirk (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on June 7, 2007, alleging disability as of December 23, 2006, due to learning disability, mild mental retardation, other mental impairments, depression, bipolar, ADD, and ADHD. (Tr. at 16, 135-42, 143-45, 172-80, 205-10, 215-20.) The claims were denied initially and upon reconsideration. (Tr. at 16, 78-82, 83-87, 91-93, 94-96.) On March 5, 2008, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 97-101.) The video hearing was held on August 13, 2009 before the Honorable

Valerie A. Bawolek.  (Tr. at 29-73, 105, 110.)  By decision dated January 29, 2010, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 16-28.)  The ALJ's decision became the final decision of the Commissioner on August 11, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On September 30, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie

2

case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 18.) The ALJ also found that Claimant met the insured status requirements of the Social Security Act through December 31, 2009.  Id.  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of reading disorder and personality disorder.  (Tr. at 18-20.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 21-22.)  The ALJ then found that Claimant has a residual functional capacity for a full range of work at all exertional levels, reduced by nonexertional limitations.  (Tr. at 22-26.)  Claimant has no past relevant work.  (Tr. at 26.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as car washer, hand washer of laundry, campground attendant, general laborer, and packer which exist in significant numbers in the national economy.  (Tr. at 27-28.)  On this basis, benefits were denied.  (Tr. at 28.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 31 years old at the time of the administrative hearing.   (Tr. at 33.)   He has a seventh grade education with special education and behavior disorder classes.   (Tr. at 34-35.)   In the past, Claimant testified that he worked "picking stuff up and cleaning", "working on cars, like oil changes, things like that", and has "had over 21 jobs."   (Tr. at 36-37, 39.)   The Vocational Expert [VE] testified that Claimant's jobs were "all service jobs like collecting trash, car wash, changing oil, delivering newspapers, actually inserting

newspapers, washing dishes.  The typical job lasted just about two and a half months and going back 15 years...never getting close to SGA [Substantial Gainful Employment]."  (Tr. at 67, 174, 197.)  FICA earnings for the years 1994 through 2008 indicate Claimant's total income for the 15 years was $39,451.47.  (Tr. at 148.)   When asked by the ALJ "Which job did you like the best?" Claimant responded "None of them."  (Tr. at 37.)

Claimant has been incarcerated 8 times for multiple offenses including fleeing and eluding, drag racing, reckless driving, domestic violence, and grand larceny.  (Tr. at 57.) Claimant's driver's license was suspended in 2001.  (Tr. at 56.)  Claimant has six children by three different women.  (Tr. at 42.)  He testified that three of the children were "taken out of the home...and adopted...[after Claimant was] put in jail for domestic violence...the Department of Human Services...took the kids...[due to] a violent atmosphere."  (Tr. at 42.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Health Evidence

Records indicate Claimant was treated on seven occasions by Kalapala Seshagiri Rao, M.D. from December 17, 2008 to June 12, 2009.  (Tr. at 297-305, 349-51.) Although the handwritten notes are largely illegible, the typed notes from the initial evaluation, state:

**CHIEF COMPLAINT**: Low back pain for many years.

**HISTORY**: This is a 30 year old white right handed man presented with the above problem.  Insidious onset but for last 2 years pain is getting worse. Was seen at the Med Express and referred to me.  Gets back pain every day most of the time like dull ache.  Pain gets worse by lifting, pushing, pulling. Pain radiates to legs with no tingling, numbness.  Gets some relief with rest, heat, Tylenol.  Denies bowel, bladder problems.  Has sleep problems. Functionally independent in all activities of daily living.  Works for

heating/cooling company.  Driving okay.

**CURRENT MEDICATIONS**: Klonopin 2 mg, Toporol XL 50 mg, Xanax 0.5 mg BID...

**PHYSICAL EXAMINATION**:
Pulse: 92  BP: 150.96  Height: 5'11"  Weight: 185 lbs...

**MUSCULOSKELETAL**:
Normal Lordosis.  No tenderness of the Cervical Paraspinals, no tenderness of the Trapezius or the Rhomboid Muscles.
ROM: Normal in Flexion, Extension, normal in Lateral Flexion and Rotation.

**RIGHT UPPER EXTREMITY**:
ROM is normal, Sensory intact for touch and pinprick, DTR's: Biceps 2+, Triceps 2+, Brachioradialis 2+.  Tinnel's negative.

**LEFT UPPER EXTREMITY**:
ROM is normal.  Sensory intact for touch and pinprick, DTR's: Biceps 2+, Triceps 2+, Brachioradialis 2+.  Tinnel's negative.

**EXAMINATION OF THE BACK**:
Normal Lordosis.  No tenderness of the Lumbar Paraspinals.  Tenderness of the LS Triangle and tenderness of the Lumbosacral area.

ROM: Normal in Flexion, decreased in Extension, normal in Lateral Flexion.

SLRT: Right is normal, Left is normal.
Patrick: Right is normal, Left is normal.

**LEFT LOWER EXTREMITY**:
ROM is normal, muscle strength is normal, sensory is intact for a touch and pinprick
DTR's: Knee jerk 1+, Ankle jerk 1+, Plantar Flexor

**RIGHT LOWER EXTREMITY**:
ROM is normal, muscle strength is normal, sensory is intact for a touch and pinprick
DTR's: Knee jerk 1+, Ankle jerk 1+, Plantar Flexor

LEG LENGTH: ASIA to Medial Malleolus

**GAIT**: Normal
Tip Toe walking and heel walking are normal.

6

**IMPRESSION**:
Chronic low back pain sprain/strain
DDD [Degenerative Disc Disease]
R/O [Rule Out] Spondylosis
HTN [Hypertension] Anxiety

**TREATMENT PLAN**:
Discussed chronic pain management, side effects addiction explained
No driving while on medications explained
Drug Screening and Pill Count explained
Ice/Heat back protection, lifting, exercises explained
Vicodin 5/500 PO BID PRN #40
X Ray LS [Lumbosacral] Spine
RTC [Return to Clinic] 3 weeks

(Tr. at 302-04, 349-51.)

On May 6, 2009, Terrence Julien, M.D., West Virginia University Spine Center, wrote to Dr. Rao: "Thank you for referring Russell Buskirk...for a spine specialist consultation. I reviewed his medical history and films...In summary, as the treating physician, please: 1) Order a physical therapy trial... A Referral Specialist will contact the patient and facilitate scheduling the follow up appointment with a non-surgical provider." (Tr. at 295.)

On May 13, 2009, Beverly Epstein, M.D., University Health Associates, WVU [West Virginia University] Department of Orthopedics, provided a consultative examination of Claimant upon referral by Dr. Rao. (Tr. at 352-54.) Dr. Epstein concluded:

The patient is a laborer. He does roofing. He is a handyman. He is still working full-time...He is applying for Social Security disability. He has been turned down twice and he has a lawyer now to help him to get this disability...

Low back examination: Normal lordosis. Extension leads to lumbar area tightness. Flexion leads to thoracic area tightness. Lateral flexion leads to opposite low back tightness. Straight-leg raise 0-70 degrees with complaint of low back and thoracolumbar junction area tightness. SI compression and PSIS palpitation are tender bilaterally. Palpation of all the spinous processes of the lumbosacral spine is somewhat tender.

IMPRESSION AND PLAN:
1.      Lumbar sprain.
2.      Degenerative disk disease of the thoracic spine T11-12.
3.      Mild thoracic spondylosis without myelopathy at T11-12 with a herniated disk central and left paracentral, not causing any nerve root compression.
4.      Anxiety with panic attacks...

He will start physical therapy with my direction.  He will have a thoracic AP and lateral view to make sure he does not have any fractures...He refused going to the Pain Clinic.  He will try to use a brace at least for the first two hours at work so he does not bend forward and hurt his back.

(Tr. at 353-54.)

On May 13, 2009, Thuan-Phuong Nguyen, M.D., WVU Healthcare, Department of Radiology, stated that an x-ray of Claimant's thoracic spine showed: "A prominent thoracic kyphosis is seen, measuring approximately 73.2 degrees from the superior T3 to the inferior T12 levels.  Mild, anterior downsloping of several lower thoracic vertebral bodies are seen, which likely reflect a developmental variant.  No abnormal spinal subluxation or significant degenerative disk changes is identified." (Tr. at 355.)

Post-Hearing Physical Health Evidence

On September 29, 2009, a State agency medical source completed a Disability Determination Examination.  (Tr. at 367-77.) The examiner, Sushil M. Sethi, M.D., stated that Claimant's neurologic examination, extremities, cervical spine, thoracic spine, back lordosis, gait, and standing were normal and that his straight leg raising was negative. (Tr. at 368.)  He noted that records indicate that on June 12, 2009, Claimant described his back pain as 1 of 10 on a 10-point scale.  Id. He observed that although Claimant had moderate tenderness at L5-S1, he had no muscle spasm or guarding.  Id.  He concluded:

This 31-year-old man has chronic back pain, has had x-rays done, mild degenerative disease.  Hypertension has not been under control.  He is not

taking any medication.  He does not have any end-stage complications.  He has anger problem, which has been treated with counseling.

MEDICAL SOURCE STATEMENT: The claimant's ability to work at physical activities is limited due to his psychological issues.  His physical aspects further need assessment and proper treatment with medication for hypertension, which he is not taking at this time.  His hearing, speaking, and traveling are normal.

(Tr. at 369.)

On September 29, 2009, Dr. Sethi completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), wherein he marked that Claimant could occasionally lift and carry 21 to 50 pounds, frequently lift and carry 11 to 20 pounds, and continuously lift and carry to 10 pounds.  (Tr. at 372.)  He marked that Claimant could never lift or carry 51 to 100 pounds due to "ch [chronic] low back pain.  Id.  Dr. Sethi marked that Claimant could sit for 4 hours at one time without interruption; stand for 2 hours without interruption; walk for 2 hours at one time without interruption; sit for a total of 6 hours in an 8-hour work day; stand for a total of 3 hours in an 8-hour work day; and walk for a total of 3 hours in an 8-hour work day.  (Tr. at 373.)  Regarding use of hands, he found that Claimant could reach, handle, finger, feel, push/pull continuously with both his right and left hand.  (Tr. at 374.)  Regarding use of feet, he marked that Claimant could frequently operate foot controls with both his right and left foot.  Id.  He found that Claimant could perform all postural activities frequently and that he had no hearing or vision defect.  (Tr. at 375.) He marked that Claimant had "no problem" with environmental limitations and could frequently endure all conditions.  (Tr. at 376.)   He found that Claimant could perform shopping, travel without a companion for assistance, ambulate without assistance, walk a block at a reasonable pace on rough or uneven surfaces, use

standard public transportation, climb a few steps at a reasonable pace with the use of a single handrail, prepare a simple meal and feed himself, care for personal hygiene, and sort, handle and use paper/files.  (Tr. at 377.)

Mental Health Evidence

On October 9, 2006, Lily Jacob, M.D., Staff Physician, Westbrook Health Services, noted that Claimant cancelled his appointment.  (Tr. at 231.)

On October 10, 2006, Dr. Jacob examined Claimant and made this assessment:

**IDENTIFYING INFORMATION**: The patient is a 28 year old white male who came to see me today for evaluation.  He is a new client at Westbrook Health Services.  He stated that he has been feeling depressed for quite some time now, about four to five years and has never been on any medications. Patient is married with six kids ranging from six to twelve years old.  Is in the process of divorce.  Reported no drug or alcohol abuse.  Patient works full time at Wells Music Company.  Stated that he has not been sleeping well and has occasional crying spells.  He has been seperated from his wife after he caught her with another man.  Patient lives with his mother temporarily.  He also thinks about hurting himself but has not [made] plans.  He states that his life is being with his kids.  Discussed with him the possibility of starting him on Lexapro and Lunesta and the patient is agreeable to trying.

**MENTAL STATUS EXAMINATION**: The patient was pleasant and cooperative.  Eye contact is average.  Denies any homicidal ideation.  Has suicidal ideation but no plan.  Speech is talkative but not pressured.  Insight is fair and judgment seems adequate.  Patient denies hallucinations, delusions or paranoia.  Reality testing is good.  Patient is oriented to all spheres.

**PLAN**:
1.      Start Lexapro 10 mg daily.  Risk and benefits discussed with patient.
2.      Start Lunesta 3 mg at bedtime.  Risk and benefits discussed with the patient.
3.      Follow up in two weeks.

(Tr. at 230.)

On October 23, 2006, Dr. Jacob noted that Claimant was a "no show" for the scheduled appointment.  (Tr. at 229.)

10

On October 22, 2007, a State agency medical source completed a consultative examination adult mental profile report of Claimant's mental status.  (Tr. at 234-37.)  The evaluator, Brenda Tebay, M.A., Tebay Psychological Services, concluded:

> PRESENTING SYMPTOMS: Mr. Buskirk is very angry and frustrated.  He is currently involved with Wood County Child Protective Services, and four of his children are in state's custody due to "unstable living conditions."  Mr. Buskirk also presents with hopelessness, helplessness, worthlessness, guilt, does not sleep, avoids activities except when it involves his immediate family. He also isolates himself, is very nervous and fidgety.  He also has a history of domestic violence, temper tantrums, aggressive behaviors, assertive behaviors where he states that he has mood swings where he becomes loud and curses...

> MENTAL TREATMENT HISTORY: Mr. Buskirk has a history of in-home services, therapy, and psychiatric since his association with Child Protective Services through the DHHR...

> CURRENT MEDICATIONS: Current medications are Xanax 0.5 mg two times a day and Avalide for blood pressure.  These are prescribed by Dr. Zelinka...

> EDUCATIONAL HISTORY: Mr. Buskirk stated that while in the 5th grade his mother withdrew him from school because of his learning disability.[1]  He was home schooled until around the age of 16 when he was old enough to "quit" school.  Mr. Buskirk stated that he was tested and "labeled mentally impaired/retarded," which upset his mother.  He stated that he has never been able to read, write, or count money...

> DEVELOPMENTAL AND SOCIAL HISTORY: Mr. Buskirk has been married to his wife, Crystal, for three years.  He has two children outside of this relationship, ages 4 and 11.  In the household are two of his wife's children, ages 13 and 12, and four of his biological children, ages 8, 7, and twins age 5. The source of income in the household is a Social Security disability check for the oldest child, and currently they are not receiving any food stamps or medical card.

---

[1]   At the August 13, 2009 hearing, Claimant testified that he was expelled from school when he "got in a fight with a kid and stabbed him...in the back of his neck...with a pencil in school...suspended a couple of times.  I got in fights and stuff, but that was the worst thing I've ever done...[after which Claimant was sent] to the Maplewood which is an alternative school."  (Tr. at 39-41.)

<u>LEGAL HISTORY</u>: Mr. Buskirk was arrested in 1999, for grand larceny, and was placed on five years probation, which he has completed.  In 2006, he spent 24 hours in jail for domestic violence, and in 2007, he was held for contempt of court during a family court disagreement and spent 24 hours in jail...

<u>MENTAL STATUS EXAMINATION</u>: <u>Appearance</u>: Mr. Buskirk was transported to the evaluation site by his parents.  He was dressed in weather-appropriate clothing.  <u>Attitude/Behavior</u>: His psychomotor behavior was fidgety.  He was cooperative.  <u>Speech</u>: Speech was clear, coherent, and of a normal tone.  <u>Orientation</u>: He was oriented x4.  <u>Mood</u>: His mood was sad, frustrated, and at times angry when discussing his current CPS involvement.  <u>Affect</u>: His affect was nervous and anxious.  <u>Suicidal/Homicidal Ideation</u>: He denied any suicidal or homicidal ideation.  <u>Thought Process</u>: Thought processes were without impairment.  <u>Thought Content</u>: There was no indication or report of delusions or obsessions-compulsive behaviors.  <u>Perceptual</u>: There were no indications or reports of hallucinations or illusions.  <u>Abstract Thought</u>: Estimated to be in the borderline range of intellectual ability.  <u>Insight</u>: Mr. Buskirk has full insight into his disability and learning disability.  Mr. Buskirk accepts that he has problems with reading and writing and problems counting money.  However, he is not able to respond appropriately or perceive a satisfactory solution to his current situation.  <u>Judgment</u>: Moderately deficient, based on the Comprehension subtest score of 5 on the WAIS-III.  <u>Concentration</u>: Moderately deficient, based on the Digit Span subtest score of 5 on the WAIS-III.  <u>Immediate Memory</u>: Within normal limits.  <u>Recent Memory</u>: Severely deficient.  Remote Memory: Within normal limits.  <u>Social Functioning</u>: Mildly deficient.  During the evaluation, Mr. Buskirk was anxious, frustrated, angry, nervous, and sad.

<u>INTELLECTUAL ASSESSMENT</u>:
<u>WAIS-III</u>:

| IQ SCALE | SCORE | PERCENTILE | 95% CONFIDENCE |
|---|---|---|---|
| Verbal | 69 | 2 | 65-75 |
| Performance | 69 | 2 | 64-78 |
| Full Scale | 66 | 1 | 63-71 |

<u>VALIDITY</u>: These scores are considered to be a valid assessment of Mr. Buskirk's true intellectual potential.  Mr. Buskirk worked to the best of his ability.

<u>WRAT-3</u>:

| SUBJECT | STANDARD SCORE | GRADE SCORE |
|---|---|---|
| Reading | 62 | 3 |
| Spelling | 57 | 2 |
| Arithmetic | 53 | 2 |

<u>VALIDITY</u>: These scores are also considered to be a valid assessment of Mr. Buskirk's achievement as pace and persistence was within normal limits.

<u>DIAGNOSTIC IMPRESSIONS</u>:

| Axis I | 300.02 | Generalized anxiety disorder. |
|---|---|---|
| | 296.32 | Major depressive disorder, recurrent, moderate. |
| | 296.80 | Bipolar disorder, not otherwise specified [NOS]. |
| | 312.30 | Impulse control disorder, NOS |
| | 305.1 | Nicotine dependence. |
| | | |
| Axis II | 317 | Mild mental retardation, onset before age 18, by history and report. |
| | 301.9 | Personality disorder, NOS. |
| Axis III | | None reported. |

<u>PROGNOSIS</u>: Poor due to Mr. Buskirk's cognitive deficits.

<u>CAPABILITY</u>: If awarded finances, Mr. Buskirk would not be able to care for those finances independently due to cognitive problems.

(Tr. at 235-37.)

On October 29, 2007, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 238-51.) The evaluator, Joseph Shaver, Ph.D., concluded that a Mental Residual Functional Capacity [RFC] assessment was necessary. (Tr. at 238.) He found that Claimant had a "mild" degree of limitation in "restriction of activities of daily living" and "difficulties in maintaining social functioning." (Tr. at 248.) He found that Claimant had a "moderate" degree of limitation in "difficulties in maintaining concentration, persistence or pace" and no episodes of decompensation, each of extended duration. <u>Id</u>. Dr. Shaver concluded that the evidence does not establish the presence of the "C" criteria. (Tr. at 249.)

On October 29, 2007, Dr. Shaver completed a Mental RFC Assessment. (Tr. at 252-55.) He concluded that Claimant was not significantly limited in the following areas: the ability to remember locations and work-like procedures; the ability to understand and

remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. (Tr. at 253-54.)

Dr. Shaver marked that Claimant was "moderately limited" in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id. Dr. Shaver concluded:

> Clmt [Claimant] appears to be generally credible regarding his reported mental functioning. Clmt fixes simple meals, does laundry, mows grass, cleans, shops, pays bills with help and counts change. It is believed that Clmt

14

retains the mental capacity to operate in routine, low stress, work situations
that require only two to three step operations.

Tr. at 254.)

Records indicate Claimant was treated by E. Kathryn Worthington, M.D.,
Worthington Center, Inc., on 16 occasions between October 30, 2007 and April 6, 2009.
(Tr. at 275-94, 306-38.) Although the handwritten notes are largely illegible, "meds doing
well" are legible on multiple documents dated January 3, 2008, June 24, 2008, August 19,
2008, October 31, 2008, January 12, 2009, February 9, 2009, March 9, 2009, and May 4,
2009. (Tr. at 276, 285, 286, 287, 288, 306, 309, 311, 313, 315, 324, 330, 337, 338.) Other
notes indicate Claimant's mood is up and down, depending on whether visits with his
children have occurred and learning "he is being accused of molesting his daughter." (Tr.
at 276, 289, 311, 317, 321, 325.) On December 17, 2007, Dr. Worthington stated:

> MENTAL STATUS EXAM: The patient is an average height, average weight
> 29-year old white male who appears essentially his stated age. He is dressed
> in clean, casual clothes appropriate to the weather. He does wear a baseball
> cap throughout the evaluation. Grooming and hygiene are fair-to-good.
> Speech is of regular rate, rhythm, tone and volume. There is no psychomotor
> agitation nor retardation. Eye contact is fair-to-good. Intelligence is average,
> although not formally tested. He is oriented in all three spheres. Mood he
> describes "up and down. Too much worry right now." His affect is tense and
> anxious. He is cooperative to the evaluation...He reports initial and
> intermittent insomnia, sleeping two or three hours a night and not feeling
> rested upon rising. Appetite is "I eat dinner and that's it." He reports a 32
> pound weight loss over the last month...Hallucinations of an auditory nature
> are reported. He hears questions asked of him but only when it is dark.
> When it is light out, he does not have this issue. It is not necessarily when he
> is sleeping, but that appears to be part of the situation...[part of report
> missing] he might act out. All this said, he does not feel that it is very likely
> that he would actually harm someone. There is some paranoia. He does feel
> that DHHR [Department of Health and Human Resources] is against him
> and keeping his children from him are their means of getting to him. Energy
> is "not very good. Feel real weak here lately." Concentration is "poor. I can't
> stay on track." He indicates, even in his work, he becomes bored after three
> to four hours and has a difficult time staying on task. Insight and judgment

appear to be fair.  He is concerned that he is going to have to spend ten days in jail for driving on suspension.  He is concerned about his children.  They have apparently been in an abusive foster care situation which was recently corrected, and this causes him great concern.  They lost their home about three months ago, and this too is a major issue for them.

DIAGNOSTIC IMPRESSION:

| AXIS I: | 296.22 | Major Depressive Episode. Single. Moderate |
| | 300.00 | Anxiety Disorder NOS |
| | 314.00 | Possible Attention Deficit Disorder |

AXIS II     Deferred

AXIS III     Hypertension

AXIS IV     Psychosocial Stressors: Moderate-to-severe with legal issues, financial concerns, work concerns and family issues

AXIS V     Current GAF:     65
            Highest in the Past Year:     Unknown

PLAN:
1.     We will begin Effexor XR to alleviate his depressive symptoms going from 37.5 mg daily with a taper to a 150 mg daily.  He will also have Trazodone 25 to 50 mg at bedtime in an effort to improve his sleep and as an adjunct to his antidepressant.  The patient is aware of risks, benefits and alternatives and agrees to this trial.
2.     This patient is encouraged to continue with counseling and therapy.
3.     The patient will return to the office in three weeks for ongoing evaluation of medication.

(Tr. at 275.)

On January 22, 2008, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 260-73.)  The evaluator, Frank Roman, Ed.D., concluded that a Mental Residual Functional Capacity [RFC] assessment was necessary.  (Tr. at 260.)  He found that Claimant had a "mild" degree of limitation in "restriction of activities of daily living." (Tr. at 270.)  He found that Claimant had a "moderate" degree of limitation in "difficulties in maintaining social functioning" and "difficulties in maintaining

concentration, persistence or pace" and no episodes of decompensation, each of extended duration.  Id.  Dr. Roman concluded that the evidence does not establish the presence of the "C" criteria.  (Tr. at 271.)  He concluded: "Based on MER [Medical Evidence of Record] the claimant is credible.  See MRFC [Mental Residual Functional Capacity]."  (Tr. at 272.)

On January 22, 2008, Dr. Roman completed a Mental RFC Assessment.  (Tr. at 256-58.)  He concluded that Claimant was not significantly limited in the following areas: the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to work in coordination with or proximity to others without being distracted by them; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; and the ability to be aware of normal hazards and take appropriate precautions. (Tr. at 256-57.)

Dr. Roman marked that Claimant was "moderately limited" in the following areas: the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others.  Id.

Dr. Roman marked that Claimant was "markedly limited" in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions.  (Tr. at 256.)   Dr. Roman concluded:

> Limitations are noted in part 1 of the MRFC revealing moderate deficits in the Social and CPP [Concentration Persistence Pace] domains. These limitations do not meet or equal a listing.  The claimant is a 29 year old married male who completed school only to the 6th grade.  His IQ scores are in the MI [Mental Impairment] range but the MER suggests he functions in the BIF [Borderline Intellectual Functioning] range.  He worked as a tire changer, trash collector, janitor, dishwasher, and lube/oil changer.  He reports the children were removed and the judge ordered him to quit work and apply for disability even though he was successful in his job.  Based on MER he is independent in his ADLs [Activities of Daily Living] - he can use money but not manage a checkbook.  He helps with routine household chores.  Based on MER, he appears able to follow routine work duties of a 1 and 2 step nature in a low stress setting.

(Tr. at 258.)

On July 9, 2009, John R. Atkinson, Jr., M.A., a licensed clinical psychologist, provided a mental status examination per the referral of Claimant's representative.  (Tr. at 339-45, 356-63.)  Mr. Atkinson noted that Claimant was a previous "no show, stating 'I forgot about it...'  The patient came to the office on foot, a distance of ten blocks."  (Tr. at 339, 356.)  Mr. Atkinson stated:

> The patient denies any formal treatment for mental or emotional problems and states he has never been treated for alcohol or drug abuse.  This, in fact, is not the truth because I have reports from Worthington Center.  When asked about that he states he started there about three years ago, sees a nurse practitioner and, "everybody else quit."  They told him he had "bipolar, schizophrenia, ADD."  It is noted that the patient does not meet the criteria for any of these disorders and, in fact, there is no such disorder as "ADD", it

is ADHD. He has never had a manic or hypomaniac episode and is not schizophrenic. In reference to ADHD, he cannot be diagnosed with that disorder for a variety of reasons...the patient has [borderline personality disorder] and he also has a mood disorder.

*      *      *

EDUCATIONAL HISTORY:
The patient attended public school to the sixth grade, then had a tutor for six months and after that, was home schooled by his mother and was credited with going to the ninth grade. He left school because of assaultive behavior toward others...had few or no friends because he was a bully, didn't like people and because of his attitude of rebellion and conflict. He was acting out in school because of the way he was treated at home by his father...The patient was given the Wide Range Achievement Test and was found to be reading at a 4.5 grade level and doing math at a 3.3 grade level. This confirms the fact that the patient is semi illiterate in both reading and calculation. It is felt that this is probably due to his poor school experience rather than any native learning disabilities...

SOCIETAL ADJUSTMENT:
The patient admits to having been arrested for domestic violence, grand larceny, nonpayment of child support, bad checks, assault both in jail and out of jail but has nothing pending now...

MENTAL STATUS EXAMINATION:

| | |
|---|---|
| APPEARANCE: | In appearance, the patient was noted to be a good size, well-developed, well-nourished, right-handed male of 30 years with sandy-brown hair, beard and blue eyes. |
| ATTITUDE/BEHAVIOR: | His attitude was affable and low-key. |
| SOCIAL: | Social rapport was easy. |
| SPEECH: | Speech patterns tended to be relevant, coherent and appropriate to the conversation. |
| ORIENTATION: | Today the patient was well oriented as to time, place and person. |
| MOOD: | Observed mood was neutral. |
| AFFECT: | Broad. |
| THOUGHT PROCESS: | Associations are relevant and the stream of thought is normal. |
| THOUGHT CONTENT: | The patient has adopted paranoid attitudes of distrust, has always been that way and, "all kinds of people are out to get me for stuff that I have done." His paranoid attitudes appear to be lifestyle related involving other people and |

|                          |                                                                                                               |
|--------------------------|---------------------------------------------------------------------------------------------------------------|
|                          | probably the police.                                                                                          |
| PERCEPTUAL:              | The patient denies any hallucinations or illusions.                                                           |
| INSIGHT:                 | Average.                                                                                                      |
| JUDGMENT:                | Moderately impaired, the patient stating that if he found a letter on the street he would leave it alone.     |
| IMMEDIATE MEMORY:        | Within normal limits, the patient immediately recalled four of four words.                                    |
| DELAYED MEMORY:          | Markedly impaired, the patient recalled none of the four words.                                               |
| REMOTE MEMORY:           | Somewhat vague and inexact as assessed by history recall.                                                     |
| CONCENTRATION:           | Markedly deficient based upon an Arithmetic Raw Score of 7, Scale Score of 4 and Standard Score of 60         |
| ATTENTION:               | Moderately deficient based upon a Digit Span Raw Score of 13, Scale Score of 6 and Standard Score of 76       |
| ABSTRACT REASONING:      | Markedly deficient based upon a Similarities Raw Score of 12, Scale Score of 5 and Standard Score of 70       |

It is noted that his Reading Standard Score of 67 and Math Standard Score is 76. All of these scores are consistent with borderline intelligence although in face-to-face conversation, the patient does not appear unintelligent at all but he may be just more shrewd than having academic intelligence...

|                          |                                                          |
|--------------------------|----------------------------------------------------------|
| PSYCHOMOTOR BEHAVIOR:    | Normal based on clinical observation.                    |
| PERSISTENCE:            | Average as demonstrated by examination behavior.         |
| PACE:                   | Average as observed during the examination.              |
| SOCIAL FUNCTIONING:     | Within normal limits during the examination.             |

SOCIAL FUNCTIONING (SELF-REPORTED):
The patient does not attend church, makes no visits to friends but states his girlfriend comes to see him when his wife is not around. He goes to visit his mother occasionally but no relatives come to see him. The patient engages in no entertainment outside the home such as dinner, movies, clubs, etc....

SUMMARY AND CONCLUSIONS:

In summary, we see here a 30-year-old male who was abused and neglected as a child and who immediately turned that outward against others with serious assaults in school and, in fact, was told to leave school at the end of sixth grade and not to come back.  This has continued on with frank violations of the rights of others, arrests, jail, going out on his wife and various women and having children with them.  He has disturbed relationships and appears to have a combination of an antisocial personality with some borderline personality features.  The patient describes depressive moods and a chronic anger state disorder, has had a marginal vocational history and currently complaining of back problems.  Stating he can no longer do general labor.

The patient appears to be of borderline intelligence with grade school reading and math but appears more shrewd than that and more insightful in face-to-face conversation.  Basically, the patient is suffering from a personality disorder of a type that would render him exploitative, undependable, touchy and volatile and he could be a danger to his coworkers and others.

It is felt that his prospects for meaningful employment are quite limited and that, in fact, he will always have problems with other people wherever he goes, at anyplace and anytime.

DIAGNOSIS:

| | | |
|---|---|---|
| Axis I. | 296.90 | Mood Disorder - NOS |
| Axis II. | 301.7 | Antisocial Personality Disorder with Borderline Personality Features |
| Axis III. | | See Medical Reports |
| Axis IV. | | Relational Problems, Financial Problems, Health Issues |
| Axis V. | | GAF = 55, Moderate to Serious Impairment, Current and Past Year |

RATIONALE:

| | |
|---|---|
| 296.90 | Manifested by a long history of off and on depressions beginning in childhood and also a prominent, chronic Anger State Disorder which also began in childhood and which is manifested by bullying and assaults on others.  He shows emotional instability associated with borderline personality traits of which chronic anger is most manifest.  The patient is also frequently agitated, restless and bored, craving excitement and violating the rights of others. |
| 301.7 | Manifested by a full spectrum of antisocial personality problems with borderline features including unstable |

relationships, exploitative attitudes, arrests, jail, serious assaults on others, choking his wife, kicking somebody's ribs in, "other fights too." which began early and his agitation may be increased by the amphetamines that he has been prescribed at the community mental health center.  It is felt that the patient is careless, restless, undependable, touchy, has consistently violated ethical rules and failure to perform behavior to society's traditional code of conduct.

PROGNOSIS:      Guarded.

CAPABILITY: If any benefits are granted, the patient would be able to manage his own financial affairs, including money payments.

(Tr. at 340-45, 358-63.)

On July 9, 2009, Mr. Atkinson completed a "Mental Assessment of Ability to do Work-Related Activities" form.  (Tr. at 346-48, 364-66.)  He marked that Claimant had no impairment in his ability to "understand, remember and carry out simple job instructions" and "maintain personal appearance."  (Tr. at 347-48, 365-66.)  He marked that Claimant had a "slight" impairment in his ability to "function independently."  (Tr. at 347, 365.)  He marked that Claimant had a "moderate" impairment in his ability to "use judgment; deal with work stressors; understand, remember and carry out detailed, but not complex job instructions; relate predictably in social situations; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. at 347-48, 365-66.)  He marked that Claimant had a "marked" impairment in his ability to "follow work rules; relate to co-workers; deal with the public; interact with supervisors; maintain attention/concentration; understand, remember and carry out complex job instructions; behave in an emotionally stable manner."  Id.

22

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because "[t]he ALJ violated HALLEX [Hearings, Appeals and Litigation Law Manual] by failing to hold a supplemental hearing in this case, following the submission of new evidence by proffer and request for supplemental hearing by the claimant's representative...It is a clear violation of HALLEX I-2-7-1 and I-2-7-30 to not allow the Plaintiff the opportunity to respond to the evidence." (Pl.'s Br. at 2-3.) Claimant further argues that "[t]he ALJ failed to comply with SSR [Social Security Ruling] 96-8p in assessing the claimant's RFC because the ALJ's RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence." (Pl.'s Br. at 3-4.)

<u>The Commissioner's Response</u>

The Commissioner argues that the standard for disability under the Act is stringent, that the ALJ proceeded through all five steps and determined that Claimant could perform work in the national economy and, therefore, was not disabled under the Act. (Def.'s Br. at 13-14.) The Commissioner asserts that "[t]he ALJ complied with the HALLEX when she determined that a supplemental hearing was not necessary." (Def.'s Br. at 14-16.) The Commissioner further argues that "[t]he ALJ complied with Social Security Ruling 96-8p." (Def.'s Br. at 16-17.)

<u>Analysis</u>

<u>HALLEX [Hearings, Appeals and Litigation Law Manual]</u>

Claimant first argues the ALJ violated HALLEX by failing to hold a supplemental hearing in this case:

In the present case, the Plaintiff was sent for physical examination post-

hearing.  The Plaintiff attended his consultative examination on September 29, 2009.  The ALJ proffered the results of the consultative examination to the Plaintiff and his representative on November 2, 2009. [Exhibit 13 E; (Tr. at 222-223).]  On November 6, 2009, the Plaintiff's representative submitted a request to the ALJ requesting a supplemental hearing.  However, a supplemental hearing was not scheduled, and instead, an unfavorable decision was issued.

The ALJ cited the consultative examination in her decision, stating, "notes from the September 2009 consultative examination, indicated the claimant's hypertension was without complications (Exhibit 17F, p. 3)" See Transcript pg. 19.

The ALJ proffered the evidence to the Plaintiff in a timely manner and the Plaintiff's representative responded in a timely manner requesting a supplemental hearing.  It is a clear violation of HALLEX I-2-7-1 and I-2-7-30 to not allow the Plaintiff the opportunity to respond to the evidence.

(Pl.'s Br. at 2-3.)

The Commissioner responds that HALLEX I-2-7-1 and HALLEX I-2-7-30 do not require the ALJ to hold a supplemental hearing as Plaintiff requested:

In this case, the ALJ properly determined that a supplemental hearing was not necessary.  First, with regard to the proffer procedures, Plaintiff notes that he requested a supplemental hearing after the ALJ proffered the results of the consultative examination (Pl.'s Br. at 2).

However, Plaintiff fails to articulate how the ALJ failed to comply with the proffer procedures.  See HALLEX I-2-7-30.  Indeed, there is no requirement to hold a supplemental hearing merely because  Plaintiff requests one.  Second, Plaintiff points out that HALLEX I-2-7-1 requires that claimant be afforded the opportunity to "request a supplemental hearing" (Pl.'s Br. at 2).  Indeed, Plaintiff was provided an opportunity to make such a "request" and Plaintiff did so (Pl.'s Br. at 2-3, HALLEX I-2-7-1).  However, there is no requirement that the ALJ must hold a supplemental hearing.  Third, no other HALLEX provisions mandate that an ALJ hold a supplemental hearing under the facts of this facts (sic, case).

(Def.'s Br. at 14-15.)

HALLEX is the SSA's publication which provides guidelines regarding how ALJ's

and other Social Security Disability adjudicators are to handle various aspects of the Social

Security Disability appeals process.  HALLEX is written primarily to lay out the policies

which are to be followed during the hearing before an ALJ and the rest of the appeals

process.  HALLEX I-2-7-1 (Posthearing Actions - General) states:

> Most posthearing actions involve the development and receipt of additional
> evidence.  When an Administrative Law Judge (ALJ) receives additional
> evidence after the hearing from a source other than the claimant or the
> claimant's representative, and proposes to admit the evidence into the record,
> the ALJ must proffer the evidence, i.e., give the claimant and representative
> the opportunity to examine the evidence and comment on, object to, or refute
> the evidence by submitting other evidence, requesting a supplemental
> hearing, or if required for a full and true disclosure of the facts, cross-
> examining the author(s) of the evidence. (See I-2-7-30, Proffer Procedures.)
> If the claimant has executed a Waiver of the Right to Examine Posthearing
> Evidence received by the ALJ after the hearing, then the proffer procedures
> do not need to be followed. (See I-2-7-15 - Waiver of the Right to Examine
> Posthearing Evidence and I-2-5-1 - Hearings -General.)

www.ssa.gov/OP_Home/hallex/I-02/I-2-7-1.html

> HALLEX I-2-7-30 (H)(Action on Receipt of Comments After Proffer) states:

> The ALJ must address proffer comments in the rationale of the written
> decision. The ALJ must make a formal ruling in the decision or by separate
> order on any objections to proffered evidence, and make the ruling a part of
> the record. If the record must be kept open for the submission of additional
> evidence, the ALJ should set a time limit for the submission of the evidence.
> The ALJ should provide the claimant a copy of his/her ruling on any
> objection if the ruling is handled by separate order.

> If the claimant requests a supplemental hearing, the ALJ must grant the
> request, unless the ALJ receives additional documentary evidence that
> supports a fully favorable decision.

> If the claimant requests an opportunity to question the author(s) of any
> posthearing report other than the written response of an ME or VE to
> interrogatories, the ALJ must determine if questioning of the author is
> required to inquire fully into the matters at issue and, if so, whether the
> questioning should be conducted through live testimony or written
> interrogatories (considering the difficulty of anticipating in written

interrogatories all the questions that might arise and the claimant's opportunity for a supplemental hearing).

If the claimant asks to question an ME or VE who has responded to interrogatories, the ALJ should apply the provisions of, as appropriate, I-2-5-44, Action When ALJ Receives Medical Expert's Responses to Interrogatories, or I-2-5-58, Action When ALJ Receives Vocational Expert's Responses to Interrogatories.

If the ALJ requests the author to appear for questioning, and the author declines to appear voluntarily, the ALJ should apply the provisions of I-2-5-78, Use of Subpoenas — General, to determine if the claimant should be afforded use of the subpoena and consequent cross-examination. If a subpoena is issued, the procedures in I-2-5-80, Preparation and Service of a Subpoena, and those in I-2-5-82, Noncompliance with a Subpoena, apply.

www.ssa.gov/OP_Home/hallex/I-02/I-2-7-30.html.

The record shows that on November 2, 2009, the ALJ proffered the September 29, 2009 physical consultative examination report of Sushil M. Sethi, M.D. to Claimant's representative. (Tr. at 222.) The letter states:

I have secured additional evidence that I propose to enter into the record. I am enclosing **[17f]** for your review.

**Actions You Have a Right To Take**
You may submit any or all of the following: written comments concerning the enclosed evidence, a written statement as to the facts and law you believe apply to the case in light of that evidence, and any additional records you wish me to consider (including a report from the treating physician). You may also submit written questions to be sent to the author(s) of the enclosed report(s).

You may also request a supplemental hearing at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law. If you request a supplemental hearing, I will grant the request unless I receive additional records that support a fully favorable decision. In addition, you may request an opportunity to question witnesses, including the author(s) of the enclosed report(s)...

**Actions I Will Take If I Do Not Hear From You**
If I do not receive a response from you within 10 days of the date you receive

> this notice, I will assume that you do not wish to submit any written statements or records and that you do not wish to request a supplemental hearing or to orally question the author(s) of the enclosed report(s).  I will then enter the enclosed evidence in the record and issue my decision.

(Tr. at 222-23.)

The undersigned has thoroughly examined the record and does not find any evidence that on "November 6, 2009, the Plaintiff's representative submitted a request to the ALJ requesting a supplemental hearing" as is asserted by Claimant's representative.  (Pl.'s Br. at 2-3.)   Nor can the undersigned find that the ALJ "determined that a supplemental hearing was not necessary."  (Def.'s Br. at 14.)

The undersigned finds it interesting that Claimant's representative writes: "The ALJ proffered the results of the consultative examination to the Plaintiff and his representative on November 2, 2009. [Exhibit 13 E; (Tr. at 222-223).]  On November 6, 2009, the Plaintiff's representative submitted a request to the ALJ requesting a supplemental hearing." (Pl.'s Br. at 2-3.)  The undersigned notes that a citation is provided for the ALJ's proffered evidence letter but that Claimant's representative does not provide a citation from the record of the alleged request for a supplemental hearing.  The undersigned further notes that the Commissioner has not cited to the record regarding the alleged request for a supplemental hearing nor the ALJ's alleged "determination that a supplemental hearing was not necessary."  (Def.'s Br. at 14.)

HALLEX I-2-7-30 (H) states that the ALJ must address proffer comments in the rationale of the written decision.  In this case, the record does not show that proffer comments were offered by Claimant's representative nor that a request for a supplemental hearing was made.  The undersigned is limited to a review of the record sent up from the

lower court and the briefs filed by the appellant and appellee.

The evidence in question was requested by Claimant's counsel at the August 13, 2009 hearing:

ATTY:    Your Honor, if the court does believe that the original hypothetical is correct, we ask that at least he be sent out for a physical.

ALJ:     I will do that.  I am just trying to find the proper place to write all these things down.  All right.  That's what we'll do then.

ATTY:    Okay.

(Tr. at 71-72.)

Claimant states that "[i]t is a clear violation of HALLEX I-2-7-1 and I-2-7-30 to not allow the Plaintiff the opportunity to respond to the evidence." (Pl.'s Br. at 3.)  The undersigned agrees with this statement and also finds that Claimant was given an opportunity to respond to the report of Dr. Sethi and failed to do so.  (Tr. at 222-23.)  The letter from the ALJ proffering the subject evidence gave Claimant ten days to respond to the subject evidence and the record indicates that Claimant failed to do so.  Id.  It is further noted that Claimant's brief offers no articulation as to how the ALJ failed to comply with the proffer procedures.  (Pl.'s Br. at 1-5.)  The Claimant's brief offers no explanation regarding why he needed a supplemental hearing.  Id.

In regard to the subject evidence, a September 29, 2009 consultative examination report by Sushil M. Sethi, M.D. (Tr. at 367-77), the ALJ stated in her Decision: "The undersigned notes the record was held open subsequent to the hearing in order for the claimant to undergo a physical consultative examination and for submission of medical

records.  Additional records received and marked as Exhibits 15F, 16F, and 17F."  (Tr. at 16.)
The two references to the subject consultative examination in the ALJ's Decision are as
follows: "The record reveals the claimant has a history of hypertension.  However, notes
from the September 2009 consultative examination, indicated the claimant's hypertension
was without complications (Exhibit 17F, p. 3).  Accordingly, the undersigned finds this
impairment to be non-severe."  (Tr. at 19.)  The ALJ continued:

> Additionally, on September 29, 2009, Sushil M. Sethi, M.D., performed a
> consultative examination of the claimant and found evidence of moderate
> tenderness of L5-S1 of the lumbosacral spine; however, the claimant had no
> evidence of muscle spasm or guarding (Exhibit 17F, p. 2).  It is further noted
> the claimant's ability to ambulate was normal (Exhibit 17F, p. 3).  The
> undersigned notes there is no evidence of record indicating the claimant went
> to physical therapy sessions mentioned above indicating that his condition
> is not as severe as alleged.  The claimant's medication form suggested he was
> not taking any medication for his back condition (Exhibit 12E).  Moreover,
> there is no evidence of record indicating the claimant has undergone any type
> of steroid injections or surgical procedure for his condition.  Accordingly, the
> undersigned finds the alleged severity of the claimant's back condition is not
> supported by the objective medical evidence of record and finds the condition
> is non-severe.

(Tr. at 20.)

It is Claimant's responsibility to prove to the Commissioner that he or she is
disabled.  20 C.F.R. §§ 404.1512(a) and 416.912(a) (2011).  Thus, Claimant is responsible
for providing medical evidence to the Commissioner showing that he or she has an
impairment.  Id. §§ 404.1512(c) and 416.912(c).  In Bowen v. Yuckert, the Supreme Court
noted:

> The severity regulation does not change the settled allocation
> of burdens of proof in disability proceedings.  It is true . . . that
> the Secretary bears the burden of proof at step five . . . [b]ut the
> Secretary is required to bear this burden only if the sequential

> evaluation process proceeds to the fifth step.  The claimant first
> must bear the burden . . . of showing that . . . he has a medically
> severe impairment or combination of impairments . . . .  If the
> process ends at step two, the burden of proof never shifts to the
> Secretary.  . . .  It is not unreasonable to require the claimant,
> who is in a better position to provide information about his
> own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, she is not required to act as plaintiff's counsel.  Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).  Claimant bears the burden of establishing a prima facie entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, he or she "bears the risk of non-persuasion."  Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Thus, the court proposes that the presiding District Judge **FIND** that the ALJ did not violate HALLEX protocol in her handling of the supplemental evidence requested by Claimant's representative, as the record contains neither a request for a supplemental hearing by Claimant's representative nor any proffer comments.

Social Security Ruling 96-8p

Claimant next argues that the ALJ "did not comply with SSR 96-8p in assessing the claimant's RFC because the ALJ's RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence."  (Pl.'s Br. at 2.)  Specifically, Claimant asserts:

Dr. Linton testified at the hearing that he agreed with Mr. Atkinson's opinion that the claimant was markedly limited in his ability to behave in an emotionally stable manner, stating that the claimant was easily provoked and had a history of altercations. The ALJ gave "great weight to the opinion of Dr. Linton" (Transcript pg. 26). However, Dr. Linton stated the claimant is "less than markedly impaired in his ability to follow rules, his ability to deal with the public and maintain emotional stability is markedly impaired, and the claimant has moderate limitations in concentration, persistence, and pace" (Transcript pg. 26).

The ALJ limited the Plaintiff to "a position that requires no reading above the third grade level due to functional illiteracy. He should be limited to simple job instructions due to his learning disability. Additionally, this individual should work in a position that is solitary for the most part. The claimant may have only occasional contact with coworkers and supervisors and should never work in public service" (Transcript pg. 22).

The claimant testified that he has been fired from several jobs due to altercations with supervisors, has been incarcerated more than eight times, and that law enforcement has been to his house numerous times due to domestic disputes (Transcript pgs. 37, 43). The ALJ found that the claimant had marked difficulties in social functioning (Transcript pg. 21).

The ALJ's RFC stating that the Plaintiff should work in a position that is solitary for the most part and should only have occasional contact with coworkers and supervisors is incomplete and inconsistent. The Plaintiff's ability to function socially is so limited that he would be unable to maintain substantial gainful activity. The medical evidence in the claim conflicts with the given RFC and must be resolved.

(Pl.'s Br. at 4.)

The Commissioner responds that the ALJ fully complied with SSR 96-8p:

There is no merit to Plaintiff's claim that the ALJ failed to comply with Social Security Ruling (SSR) 96-8p (Pl.'s Br. at 3-4). The ALJ adequately explained Plaintiff's specific functional abilities in her decision (Tr. 22-26). The ALJ found that Plaintiff could not read above the third grade level due to functional illiteracy (Tr. 22). The ALJ concluded that because of Plaintiff's learning disability, he should be limited to jobs involving no more than simple instructions (Tr. 22). She also determined that Plaintiff required an occupation that allowed him to be solitary; that he should have only

occasional contact with co-workers and supervisors; and that he should not hold a public service position (Tr. 22).  In arriving at her RFC determination, the ALJ gave great weight to the opinion of Dr. Marshall, who pointed out Plaintiff's normal imaging results and that he did not require prescription pain medication objective (Tr. 46).    Accordingly, the ALJ properly determined that Plaintiff had no physical limitations to incorporate into her RFC determination.

From a mental standpoint, the ALJ gave great weight to the impartial medical examiner, Dr. Linton, who testified extensively regarding Plaintiff's limitations (i.e., noting that Plaintiff had difficulty interacting with others; was interpersonally hypersensitive; and had an anti-social personality style) (Tr. 60-62).  Consistent with Dr. Linton's testimony, the ALJ adopted an RFC that accommodated Plaintiff's various non-exertional limitations (Tr. 22).  The ALJ's explanation was more than sufficient to comply with SSR 96-8p.

Plaintiff also complains that the ALJ's RFC is "inconsistent" in that the ALJ found that Plaintiff should perform work that was "solitary for the most part" and involve only occasional contact with coworkers and supervisors (Pl. Br. at 4).  Plaintiff's argument makes no sense and Plaintiff fails to explain his "inconsistency" argument any further - contrary to Plaintiff's complaint, a job that is primarily solitary is one that would involve only occasional contact with co-workers and supervisors.

(Def.'s Br. at 16-17.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions."  See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).  Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. §§ 404.1545(a) and 416.945(a) (2011).  "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  Id.  "In determining the claimant's residual

functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The ALJ made these findings regarding Claimant's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but has nonexertional limitations.  The undersigned finds the claimant should work in a position that requires no reading above the third grade level due to functional illiteracy.  He should be limited to simple job instructions due to his learning disability.  Additionally, the individual should work in a position that is solitary, for the most part.  The claimant may have only occasional contact with coworkers and supervisors and should never work in public service.

*     *     *

The claimant alleges disability due to learning disability, mild mental retardation and other mental impairments.  The claimant reported he had difficulty reading.  He noted he could only write his name.  The claimant reported getting frustrated easily.  He suggested that he did not like to be around people; he indicated that he had antisocial and impulsive behavior. The claimant testified that he quit going to school because he was indefinitely expelled from Wood County Schools for stabbing anther student in the back of his neck with a pencil.  The claimant noted that he failed kindergarten and fourth grade.  He attended behavior disorder classes while in school.  His

classroom consisted of two to three students.  He noted that he got in to fights while in school and was suspended.  The claimant testified that he has had 21 different jobs in the last 15 years.  He has been fired from three different jobs since 2006 due to his inability to get along with his supervisors.  He noted that he was terminated from a temporary agency due to his inability to read. The claimant stated that his wife has to complete his employment applications for him.  The longest he has ever worked at one job is seven months.  He prefers working alone and has only two friends.  The claimant noted that he has been in jail on at least eight different occasions.  He testified that law enforcement had been called to his home eight times during a two week span due to domestic violence, and that three of his children were taken out of his home by Child Protective Services due to allegations of domestic violence.

After consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The record reveals the claimant has evidence of a reading disorder, however, as noted above, school records indicated the claimant achieved a verbal IQ of 82, performance IQ of 84, and full scale IQ of 81, which fall within the low average range of intellect (Exhibit 1E, p. 2).  Dr. Linton testified the claimant's IQ while in school, before age 22, was above listing level.  Dr. Linton further testified the claimant's condition did not meet Listing 12.05 but the claimant does have evidence of a reading disorder.  Accordingly, the undersigned finds the residual functional capacity noted above more than accommodates this condition.  The claimant's reading disorder would not interfere with the jobs identified below by the vocational expert.

As to the claimant's activities of daily living, a note from Dr. Rao dated December 17, 2008, revealed the claimant was independent in all activities of daily living (Exhibit 14F, p. 1 and 11F, p. 6).  Additionally, at one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: cleaning, cooking, helping with his children, mowing the lawn, laundry, and shopping (Exhibit 4E).  Accordingly, the undersigned finds the claimant's daily activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

Further, during the 2009 consultative examination the claimant reported he had worked during 2008 for Prince Heating and Cooling Company; he noted he was no longer working for this employer because he was laid off (Exhibit 17F). Accordingly, the undersigned finds the claimant lost his job during 2008 because he was laid off, not due to a medical condition. Moreover, at the hearing, the claimant testified that he is looking for work, which suggests the claimant's condition may not be as severe as alleged.

Additionally, the claimant reported to Mr. Atkinson that he was applying for disability due to his back, not his mental condition (Exhibits 13F and 16F). The undersigned notes the claimant's back condition is not a severe impairment, given the evidence of record.

The undersigned also notes that the claimant has provided conflicting information regarding his education. In Exhibit 4F, the claimant indicated his mother had withdrawn him from fifth grade and had homeschooled him. In Exhibit 9F, the claimant reported he had gone to school through the seventh grade. Additionally, the claimant reported to Mr. Atkinson that he had attended school through sixth grade and was homeschooled until the ninth grade; he also noted he was retained during first grade (Exhibits 13F and 16F). Further, the claimant reported to Dr. Sethi he had dropped out of school after seventh grade due to anger problems. At the hearing, the claimant testified he had completed the seventh grade; he also noted failing kindergarten and fourth grade. Accordingly, the undersigned finds that these inconsistent statements call into question the credibility of the claimant.

The record also revealed that the claimant failed to show up for doctor appointments on more than one occasion, indicating that his condition is not as severe as alleged (Exhibit 1F and 13F).

Further, there are no side effects of medication established which would interfere with the jobs identified below by the vocational expert.

As for the opinion evidence, Robert Marshall, M.D., an impartial medical expert, noted the claimant alleges disability due to pain of his back and legs. Dr. Marshall testified the medical evidence indicates the claimant's lumbar spine is normal; he found nothing in the record to explain the claimant's alleged pain in his legs. Dr. Marshall noted evidence showing that the claimant has degenerative changes of the T11-T12 portion of his spine. However, Dr. Marshall noted that the T11-T12 level provides sensation to the middle of the abdomen; it does not involve the back or legs. He noted the evidence of record does not explain the claimant's allegations of pain in his

back and legs.  Dr. Marshall pointed out that treatment records from Dr. Rao show normal gait and heel walking.  Additional records from Dr. Rao suggest the claimant's strength, reflexes, and lumbar spine are normal.  Dr. Marshall noted that an x-ray of the claimant's back reveals minimal curvature of the spine; no medication has been prescribed for the claimant's alleged back condition.  Dr. Marshall opined the claimant had no severe physical impairments.  The undersigned gives great weight to the opinion of Dr. Marshall as consistent with the objective medical evidence of record.

As noted above, Ms. Tebay found the claimant's IQ scores from the 2007 consultative examination to be valid; however, Dr. Linton testified the claimant's IQ scores were after his 22nd birthday and inconsistent with his IQ scores from 1989 which were in the eighties (Exhibit 1E and 4F).  The record does not indicate any intervening factor, such as brain trauma or stroke, to support cognitive decline.  The claimant's activities and work history do not support mild mental retardation.  Accordingly, the undersigned rejects the opinion and findings of Ms. Tebay as inconsistent with the testimony of Dr. Linton and the record as a whole.

On October 29, 2007, Joseph A. Shaver, Ph.D., a reviewing psychologist for the state agency, completed a Psychiatric Review Technique form and found the claimant had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; no episodes of decompensation; and no "paragraph C" criteria (Exhibit 5F).  Dr. Shaver also completed a Mental Residual Functional Capacity (RFC) form and opined the claimant was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, make work-related decisions, and complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  "Moderate" is not defined and these ratings by Dr. Shaver are given no weight.  However, Dr. Shaver more clearly opined that the claimant retained the mental capacity to operate in routine and low stress work situations that required only two to three step operations (Exhibit 6F).  Weight is given to this opinion of Dr. Shaver as consistent with the residual functional capacity finally determined by the undersigned.

On January 22, 2008, Frank Roman, Ed.D., a reviewing psychologist for the state agency, completed a Psychiatric Review Technique form and found the claimant had mild limitation in restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties

in maintaining concentration, persistence or pace; no episodes of decompensation; and no "paragraph C" criteria (Exhibit 8F). Dr. Roman also completed a Mental RFC form and opined the claimant was markedly limited in his ability to understand, remember, and carry out detailed instructions. Dr. Roman further opined the claimant was moderately limited in his ability to maintain attention and concentration for extended period, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavior extremes, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  Dr. Roman further noted the claimant was independent in his activities of daily living; he noted that the claimant could use money but could not manage a checkbook.  Additionally, Dr. Roman indicated the claimant could follow routine work duties of a one and two step nature in a low stress work environment (Exhibit 7F).  Some weight is given to the opinion of Dr. Roman because aspects of the doctor's opinion are consistent with the final residual functional capacity noted above.

On July 9, 2009, Mr. Atkinson evaluated the claimant and opined that he had marked limitations (defined as severely limited but not precluded) in his ability to understand, remember and carry out complex job instructions and maintain personal appearance. Mr. Atkinson further opined the claimant had moderate limitations (defined as moderate limitation but still able to function satisfactorily) in his ability to understand, remember and carry out detailed, but not complex job instructions; relate predicably in social situations; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Exhibits 13F and 16F). Weight is given to the opinion of Mr. Atkinson to the extent it is consistent with Dr. Linton's testimony and the residual functional capacity noted above.

At the hearing, Dr. Linton testified the claimant has a reading disability.  He noted the claimant was reading on a first grade level at age eight.  The claimant was reading on a third grade level at the ages of 11, 12, 13, and 29. Additionally, Dr. Linton stated the claimant has personality traits that make it difficult for him to interact with others; however, he stated the claimant knows how to use his environment to get through life.  Dr. Linton opined the claimant is interpersonally hypersensitive. Dr. Linton noted the claimant has had a number of incidents with law enforcement suggesting an anti-social personality style.  Dr. Linton testified there is evidence indicating that the claimant has had multiple jobs.  Dr. Linton testified that notes from Mr. Atkinson's evaluation indicated the claimant has evidence of personality

disorder with a GAF of 55.  Dr. Linton opined the claimant's GAF had largely remained between 55 and 65.  The claimant reported to Mr. Atkinson that he has never left a job due to not getting along with others; the claimant stated that he left jobs due to emotional problems. Dr. Linton opined there is no real treatment for a personality disorder.  He noted the claimant has serious difficulty getting along with others as evidenced by problems with his siblings, parents, wife, and school system.  However, Dr. Linton questioned whether the claimant was under the influence of alcohol or drugs when easily provoked.  Dr. Linton opined that the claimant is less markedly impaired in his ability to follow rules.  His ability to deal with the public and maintain emotional stability is markedly impaired.  The claimant has moderate limitations in concentration, persistence, and pace.  Dr. Linton opined the claimant has no difficulty in the ability to understand simple instructions.  Dr. Linton opined the claimant's condition is largely a 12.08 condition; however, it does not meet or equal a listing.  Dr. Linton opined the claimant has medically determinable impairments of personality disorder and reading disorder.  The undersigned gives great weight to the opinion of Dr. Linton because it is consistent with the objective evidence of record.

In sum, the undersigned finds that the claimant's complaints and limitations are not supported by the record as a whole.

(Tr. at 22-26.)

Contrary to Claimant's assertions, the ALJ's decision fully complied with the requirements of Social Security Ruling 96-8p that

[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.  For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

It is clear that the ALJ's RFC assessment was not "simply conclusory and does not

contain any rationale or reference to the supporting evidence" as alleged by Claimant. (Pl.'s Br. at 3.) As noted above, the ALJ wrote a very thorough decision, which included extensive findings regarding her determination of Claimant's RFC. (Tr. at 22-26.) Additionally, the ALJ's RFC is not "inconsistent" in that the ALJ found that Plaintiff should perform work that was "solitary for the most part" and involve only occasional contact with coworkers and supervisors. (Pl. Br. at 4.) As pointed out by the Commissioner, contrary to Claimant's complaint, "a job that is primarily solitary is one that would involve only occasional contact with co-workers and supervisors." (Def.'s Br. at 17.)

Thus, the court proposes that the presiding District Judge **FIND** that the ALJ complied with SSR 96-8p in assessing the claimant's RFC and that contrary to Claimant's assertions, the decision contained rationale and references to the supporting evidence.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period

may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

   October 24, 2012   
        Date

                     Mary E. Stanley
                     United States Magistrate Judge